F I L E D
Clerk
District Court
OCT 20 2015
for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>    v.<br><br>QIONG LU PUA,<br><br>            Defendant. | Case 1:15-CR-00008-001<br><br>**DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL** |

## I.  INTRODUCTION

On July 31, 2015, a jury found Defendant Qiong Lu Pua guilty of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. (Verdict Form, ECF No. 76.) Pua now asks the Court to set aside the jury's verdict and enter a judgment of acquittal. (Mot., ECF No. 72.) The Court heard oral argument on Pua's motion on October 15, 2015, and denied the motion. (Min. Entry, ECF No. 82.) This decision and order memorializes that minute order and provides the Court's rationale.

The Government accuses Pua, a citizen of China and lawful permanent resident of the United States, of paying U.S. citizens to marry Chinese citizens solely for immigration benefits. Specifically, the Government alleges that Pua conspired with her U.S. citizen neighbors, Benigno Mettao and Norma Nekaifes, to marry her friend, Baoqin Ding, and her brother, Zhenqing Lu, and to apply for green cards and lie about their relationships. (Indictment, ECF No. 1.) Mettao and Nekaifes, who live and have a child together and adopted another, married Ding and Lu,

respectively, and initially lied about the legitimacy of their marriages to immigration officials. For purposes of this motion, there is no dispute about the illegitimacy of the two marriages. However, after they were indicted, Nekaifes and Mettao struck plea agreements with the Government and testified against Pua at her trial. The alleged conspirators were key witnesses; they testified that Pua proposed the scheme, paid them for their cooperation, and even helped fill out the immigration forms.

Pua argues that the testimony of Nekaifes and Mettao is insufficient to prove beyond a reasonable doubt that she participated in the conspiracy. (Mot. 4.) She contends that Nekaifes and Mettao—as alleged conspirators, plea bargain witnesses, and admitted liars—cannot be believed as a matter of law. The Court finds, however, that sufficient circumstantial and corroborating evidence exists that a reasonable trier of fact could find beyond a reasonable doubt that Pua participated in the marriage fraud conspiracy. Pua alleges no other error, and the motion must therefore be denied.

## II.  DISCUSSION

A court will not disturb a jury's verdict because of insufficient evidence unless no reasonable fact finder, viewing the evidence in the light most favorable to the prosecution, could find the defendant guilty of each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The testimony of an accomplice or conspirator is inherently suspect, *United States v. Bernard*, 625 F.2d 854, 857 (9th Cir. 1980), as is testimony from a witness seeking a government benefit from her statements, *Darden v. United States*, 405 F.2d 1054, 1056 (9th Cir. 1969), as is the testimony of a liar, *see* Fed. R. Evid. 608(b) & 609.[1] However, the law does not categorically bar convictions based on such testimony. *See Darden*, 405 F.2d at 1056 ("It is well established that a conviction in federal court may be based on uncorroborated testimony of an accomplice, if the testimony is not incredible or unsubstantial on its face.") (internal quotation

---

[1] The Jury Instructions included a warning about such testimony. (Jury Instructions, ECF No. 71.)

marks omitted). It is the role of the jury to determine the credibility of a witness—not the judge. *United States v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989) ("We must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences") (internal quotation marks omitted).

Pua points to two cases in support of her contention that the testimony of Nekaifes and Mettao cannot support her conviction: *Lyda v. United States*, 321 F.2d 788 (9th Cir. 1963), and *United States v. Haderlein*, 118 F. Supp. 346 (N.D. Ill. 1953). She argues that those cases stand for the proposition that the Government fails to provide sufficient evidence to support a conviction beyond a reasonable doubt when its only evidence consists of the uncorroborated testimony of an alleged co-conspirator who perjured himself in prior testimony about the charged offense or its subject matter. (Mot. 6.) The cases indeed provide some support for Pua's proposition, or at least some version of it, but because the Government supported its witnesses' accounts with corroborating evidence, the Court finds *Lyda* and *Haderlein* inapplicable in this case.

In *Lyda*, the Ninth Circuit reversed a bank robbery conviction that rested on only two pieces of evidence: (1) the "bizarre" testimony of an alleged conspirator, McCarter; and (2) $179 in Lyda's possession when he was arrested the night of the robbery. 321 F.2d at 793-94. McCarter, a convicted felon hoping for a lighter sentence, stated that roughly one hour before he planned to rob the bank with another defendant, on the day *after* they had initially planned the robbery, they happened on Lyda crossing the street and asked him to take part. *Id.* The minimal evidence left the Court "in something of a dilemma," because while it appeared that "McCarter's story of Lyda's part in the crime [was] not unbelievable," "there comes a point when a witness' qualifications are so shoddy that a verdict of acquittal should have been directed." *Id.* at 794-95 (citing *Haderlein*). The Court found the evidence sufficient to support the conviction, but noted that it was "so close a question as to bring into sharp relief the other errors" of the district judge, including the failure to exclude evidence of Lyda's prior arrest record. *Id.* at 796 ("Since the other evidence against Lyda was scanty, [admitting the prejudicial evidence] was clearly reversible error."). Here, Pua

3

does not assert any errors, but relies solely on the sufficiency of the evidence in her motion for judgment of acquittal.

In *Haderlein*, on the other hand, the Court entered a judgment of acquittal because the Government's evidence—including the reliability of its only witness' testimony—fell short of constitutional sufficiency. 118 F. Supp. at 349. The Government alleged that the defendant, who was the Postmaster, took bribes in exchange for promoting postal employees. During the Government's investigation, its lone material witness, Iberle, was summoned before the grand jury and testified that he took $400 that was meant to be used as a bribe for the defendant, but that he never delivered it. *Id.* at 348. Later, federal postal inspectors threatened Iberle, telling him that "he had sworn falsely and his citizenship could be revoked." *Id.* In a subsequent appearance before the grand jury, accompanied by the same postal inspectors, Iberle testified that he in fact paid the $400 to the defendant. *Id.* He gave the same testimony at trial. *Id.* at 347. Other than a letter asking the defendant for a promotion and a letter from the defendant stating that the promotion had been made, the Government introduced no evidence to corroborate Iberle's story. The Court held that in the absence of any corroborating evidence, "the sole testimony of the alleged conspirator, who testifies that he has been guilty of perjury by giving contradictory testimony before the Grand Jury under oath, does not constitute such evidence as would warrant a jury or a court finding the defendant guilty of an offense beyond a reasonable doubt." *Id.* at 348, 349 ("If this type of testimony alone and uncorroborated should be held to convict a person of crime beyond a reasonable doubt . . . [i]t would well lead in the direction of a police state in open defiance of the traditional personal safeguards of our federal constitution.")

Pua is correct that the cases reflect unease with the idea of convicting defendants on nothing more than the say-so of self-serving liars. However, the Court owes deference to the jury's credibility determinations, *see Gillock*, 886 F.2d at 222, and it is unclear how that deference can

be squared with *Haderlein*'s rule, no matter its noble sentiment.[2] At times, a court's consideration of witness credibility will have utility where, as in *Lyda*, another error is clear but its prejudice is not. 321 F.2d at 796. Alternatively, a court may grant a new trial based on its own credibility determinations and weighing of the evidence. *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992); *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980) ("If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.") Here, no error is alleged, no new trial is sought, and the evidence tends to corroborate Mettao and Nekaifes' testimony.

The common connection between all the conspirators is Pua: she connects Nekaifes and Mettao to Lu and Ding. The evidence received at the trial supports an inference that Pua participated in the wedding fraud conspiracy:

1. Mettao and Nekaifes testified that they lived together as "common law" spouses. They have a child together and adopted another, and shared a romantic relationship throughout the events of the conspiracy and trial.
2. They also testified that they knew Pua because they were neighbors.
3. Mettao, who was 22 years old at the time, married Pua's friend Ding, who is 21 years his senior, on December 9, 2010. (Mettao Marriage License, Gov't Ex. 1.) Pua signed the official marriage license as a witness. (*Id.*) Nekaifes was the other witness. (*Id.*)
4. Pua also helped photograph the couple around Saipan on the day of the wedding. (Gov't Ex. 7.)
5. According to the testimony of Mettao and Nekaifes, Mettao and Ding never lived together; Mettao continued to live with Nekaifes and their children after his marriage to Ding.

---

[2] The Court notes that the *Haderlein* judge granted the motion for judgment of acquittal before the case went to the jury. 118 F. Supp. at 347.

5

6. Pua's brother Lu arrived on Saipan from China on May 11, 2011. (Lu Passport, Gov't Ex. 19.)

7. Nekaifes testified that she first met Lu the day he arrived.

8. The next day, May 12, Lu and Nekaifes applied for a marriage license. (Nekaifes Marriage License, Gov't Ex. 11.) They were married four days later. Lu was 43 years old, and Nekaifes was 24 years old. As was the case with Mettao's marriage to Ding, Pua signed Lu and Nekaifes' official marriage license as a witness.

9. Again, according to Mettao and Nekaifes' testimony, Nekaifes and Lu never lived together.

From this series of evidence, a reasonable trier of fact could determine beyond a reasonable doubt that Pua participated in the marriage fraud conspiracy. Knowing what she knew about the wedding party, it makes more sense that Pua participated in the conspiracy than that she was an innocent bystander. As Mettao and Nekaifes' neighbor, Pua knew that they were a couple. With that knowledge, it should have struck Pua as unusual that Mettao would marry Ding absent some strife with Nekaifes. But Nekaifes witnessing the wedding and smiling in photographs would have dispelled that notion. To anyone who knew the wedding party but was not involved in the conspiracy, everything about the marriage and the photographs would have raised serious suspicion.

The inference of Pua's participation in the Nekaifes/Lu marriage fraud case is even stronger. It strains credulity to believe that Pua's brother could arrive on Saipan and immediately make plans to marry Pua's neighbor without Pua participating in the scheme. Particularly in light of the sham marriage between Mettao and Ding only five months earlier, it is much more likely that Pua purposefully arranged the fraudulent marriage as Nekaifes and Mettao testified. Any reasonable juror could have reached the same conclusion.

/ /

/

6

### III. CONCLUSION

The defense raises an important concern about the risk of convictions on wholly unreliable perjured testimony, but this is not such a case. Based on all the evidence of record construed in favor of the prosecution, the Court finds that a reasonable juror could find beyond a reasonable doubt that Pua conspired to defraud the United States. Accordingly, the Court will not disturb the jury's verdict, and Pua's motion for a judgment of acquittal is denied.

SO ORDERED this 20th day of October, 2015.

RAMONA V. MANGLONA
Chief Judge